**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| TERRI NIMMO, individually and as Administrator for the ESTATE OF JADE SMITH, and RICHARD NIMMO, | Case No. 1:26-cv-00190 |
| Plaintiffs, | |
| -against- | **AMENDED COMPLAINT** |
| THE CITY OF NEW YORK, JESS DANNHAUSER, Commissioner of the Administration for Children's Services, TAIESHA COLEMAN, AJA PANIAGUA, NADIA MCLEOD, and STACEY MELHADO, | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiffs Terri Nimmo, individually and as Administrator for the Estate of Jade Smith ("the Estate"), and Richard Nimmo, by their attorneys, Crumiller P.C., as and for their Complaint against Defendants the City of New York ("NYC"), Jess Dannhauser, Commissioner of the Administration for Children's Services ("ACS"), Taiesha Coleman, Aja Paniagua, Nadia McLeod, and Stacey Melhado, respectfully allege as follows, upon information and belief:

## PRELIMINARY STATEMENT

*"This is the most significant mental health history I have ever seen in a young child in my 40 years of working in this courthouse."*[1]

1.      On January 15, 2023, ACS killed Jade Smith, a 13-year-old girl in its care.

2.      In the summer of 2022, when Jade suffered a troubling hallucination that her stepfather had harmed her, ACS was supposed to investigate. Instead, it broke its own rules, misled the Court, and forcibly separated Jade from her family, falsely alleging that her parents had abused and neglected her.

---

[1] Transcript of Record at 11, *In Re Smith-Nimmo Children,* Dkt. Nos. NA-16906-8-22 (N.Y. Fam. Ct., Feb. 2, 2024).

1

3.      Jade began running away from the various extended family members and acquaintances ACS placed her with. On one occasion, she tried to commit suicide, and on another, she was drugged and sexually assaulted. ACS was supposed to take care of her by ensuring she had the support and resources she needed. Instead, it left her to fend for herself and did nothing but sabotage her mother's increasingly frantic attempts to help.

4.      After 4.5 months in ACS custody, Jade jumped off the Brooklyn Bridge and died.

5.      ACS should have ended its sham investigation of the Nimmo family then. Instead, it escalated, harassing the Nimmos for an entire year while knowing full well it could not sustain the allegations of abuse or neglect in court.

6.      In the spring of 2024, the Family Court dismissed the charges of abuse and neglect in full, holding that "no reasonable view of the facts" supported ACS's claims.

7.      Over the course of ACS's 20-month assault on the Nimmo family, the Nimmos lost their home, their jobs, and their 13-year-old daughter.

8.      They will never recover.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, as it is a civil action arising under the Constitution and laws of the United States, and § 1343(a)(3), as it seeks redress for the deprivation under color of State law of Plaintiffs' constitutional rights. The Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over the claims that are so related to the federal claims as to form part of the same case or controversy.

10.     Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. § 1391(b)(2) as a substantial part of the acts and omissions complained of occurred in this district.

**PARTIES**

11.     Plaintiff Terri Nimmo is a 35-year-old Black woman who resides in Brooklyn, New York with her husband, Richard Nimmo, and their two minor children, Daniel and Aria Doe.[2] She was Jade's mother.

12.     Terri Nimmo is the Administrator of the Estate of Jade Smith, a deceased child.

13.     Plaintiff Richard Nimmo is a 34-year-old Black man who resides in Brooklyn, New York with his wife, Terri Nimmo, and their two minor children. He is Jade's stepfather who raised her from infancy.

14.     Defendant NYC is a municipal corporation organized and incorporated pursuant to the laws of the State of New York.

15.     NYC is charged with certain duties and responsibilities, including under the New York Social Services Law and the New York Family Court Act. These duties and responsibilities include, but are not limited to, investigating allegations of child abuse and neglect and administering the foster care system in New York City. NYC carries out these responsibilities by and through ACS. NYC is aware of the deficient practices herein by ACS employees and has failed to take corrective or remedial action.

16.     NYC's address for service of process is c/o Corporation Counsel, 100 Church St, New York, NY 10007.

17.     ACS's headquarters are located at 150 Williams St, New York, NY 10038.

18.     Defendant Jess Dannhauser is an individual whose actual place of business, upon information and belief, is c/o ACS. Dannhauser is the Commissioner of ACS and has authority to set final, municipality-wide policy.

---

[2] The surviving children chose their own pseudonyms to aid in telling their older sister's tragic story.

19.     Defendant Taiesha Coleman is an individual who, upon information and belief, resides at 309 Caralea Valley NW Dr, Concord, NC 28027. Upon information and belief, Coleman was assigned to the Nimmo case in her capacity as an ACS Child Protective Specialist from August 2022 through February 2023.

20.     Defendant Aja Paniagua is an individual whose actual place of business, upon information and belief, is c/o ACS. Upon information and belief, Paniagua was assigned to supervise the Nimmo case in her capacity as an ACS Child Protective Specialist Supervisor from August 2022 through April 2024.

21.     Defendant Nadia McLeod is an individual whose actual place of business, upon information and belief, is c/o ACS. Upon information and belief, McLeod was assigned to supervise the investigation of the Nimmo family in her capacity as an ACS Child Protective Specialist Supervisor from August 2022 through April 2024.

22.     Defendant Stacey Melhaldo is an individual whose actual place of business, upon information and belief, is c/o ACS. Upon information and belief, Melhado was assigned to supervise the investigation of the Nimmo family in her capacity as an ACS Child Protective Manager from October 2022 through April 2024.

23.     At all relevant times, the officials, supervisors, managers, caseworkers, agents, and employees of NYC and ACS referenced herein were acting for and on behalf of NYC and ACS, with the power and authority vested in them, under color of state law, in the course and scope of their duties and functions as officials, supervisors, managers, caseworkers, agents, and employees of NYC and ACS, and otherwise performed and engaged in conduct incidental to the performance of their lawful duties.

24.     This action is brought against all individual Defendants in their official capacities and against Defendants Coleman, Paniagua, McLeod, and Melhado individually ("individual Defendants").

## LEGAL FRAMEWORK

### I.     The Rights of Children and Families

25.     As NYC's child welfare agency, ACS is tasked with "taking all appropriate measures to protect a child's life and health." N.Y. Comp. Codes R. & Regs. tit. 18 § 432.3(l).

26.     Primarily, it is responsible for investigating reports of suspected child abuse and "providing or arranging for and coordinating the provision of those services necessary to safeguard the child's well-being and development and to preserve and stabilize family life, wherever appropriate, for abused and maltreated children" in its care. *Id.* § 432.2(b)(1).

27.     When necessary, this includes the drastic measure of seeking removal of a child from her parents' home: a step for many reasons not to be taken lightly.

28.     The U.S. Supreme Court has repeatedly affirmed that the liberty interest of parents in the "care, custody, and control of their children" is constitutionally protected.[3]

29.     "Families have a recognized constitutional right to live together free from the unwarranted interference of third parties; this encompasses the right of parents to have custody of their children and the concomitant right of children to be raised by and live with their parents."[4]

---

[3] *Troxel v. Granville,* 530 U.S. 57, 65 (2000); *Santosky v. Kramer,* 455 U.S. 745, 753-54 (1982); *Stanley v. Illinois,* 405 U.S. 645, 649-52 (1972) (rights to conceive and raise one's children have been deemed "essential" and "basic civil rights of man"); *Prince v. Massachusetts,* 321 U.S. 158, 166 (1944) (the custody, care and nurture of the child reside first with the parents); *Meyer v. Nebraska,* 262 U.S. 390, 399 (1923) (liberty guaranteed by the Fourteenth Amendment includes the right to establish a home and bring up children); *see also Duchesne v. Sugarman,* 566 F.2d 817, 825 (2d Cir. 1977) (recognizing the constitutional right of the family "to remain together without the coercive interference of the awesome power of the state").
[4] *Linda B. v. Deborah C.,* 152 Misc. 2d 496, 498 (N.Y. Fam. Ct. 1991) (citing *Stanley,* 405 U.S. at 651; *Bennett v. Jeffreys,* 356 N.E.2d 277 [N.Y. 1976]; *Dickson v. Lascaris,* 423 N.E.2d 361 [N.Y. 1981]).

30.     Moreover, according to the American Association of Pediatrics, family separation can permanently and irreparably damage children by "disrupting [their] brain architecture and affecting [their] short and long-term health. This type of prolonged exposure to serious stress—known as toxic stress—can carry lifelong consequences for children."[5]

31.     Even just "[h]ome searches [by ACS workers] undermine a child's basic attachment to their parents, forever impacting their earliest and most important human relationships by fundamentally altering a child's trust in a parent's ability to protect and provide for them."[6]

32.     New York State has recognized that it is generally in a child's best interest for her family to stay together:

> The legislature recognizes that the health and safety of children is of paramount importance. To the extent it is consistent with the health and safety of the child, the legislature further hereby finds that:
> (i) it is desirable for children to grow up with a normal family life in a permanent home and that such circumstance offers the best opportunity for children to develop and thrive;
> (ii) it is generally desirable for the child to remain with or be returned to the birth parent because the child's need for a normal family life will usually best be met in the home of its birth parent, and that parents are entitled to bring up their own children unless the best interests of the child would be thereby endangered;
> (iii) the state's first obligation is to help the family with services to prevent its break-up or to reunite it if the child has already left home . . .

N.Y. Soc. Serv. Law § 384-b(1)(a).

33.     Accordingly, a child may be removed from home without her parents' consent only when it is necessary to avoid imminent danger to her life or health. N.Y. Fam. Ct. Act §§ 1022, 1024.

34.     The New York Family Court Act, "designed to provide a due process of law for determining when the state, through its family court, may intervene against the wishes of a

---

[5] Colleen Kraft, *AAP Statement Opposing Separation of Children and Parents at the Border*, Am. Acad. of Pediatrics (May 8, 2018), https://docs.house.gov/meetings/IF/IF14/20180627/108510/HMKP-115-IF14-20180627-SD011.pdf.
[6] Tarek Ismail, *Family Policing and the Fourth Amendment,* 111 Calif. L. Rev. 1485, 1489 (2023).

parent on behalf of a child so that his needs are properly met," created processes for removal proceedings. Fam. Ct. § 1011.

35.     ACS must ensure that "every family with a child at clear risk of foster care placement receives preventive services to improve the family relationships and prevent the placement." Tit. 18, § 430.8(1).

## II.     ACS Is Responsible for the Needs of a Child in Its Custody

36.     ACS is responsible for monitoring the provision of services, including foster care. "The purpose of monitoring is to ensure the continued safety of the child(ren) that risk reduction activities and services are being implemented in the established plan for services, and that the service plan is modified when progress has been insufficient." *Id.* § 432.2(b)(5)(ii).

37.     Further, at all times, ACS is required to make diligent efforts to achieve permanent discharge of a child from foster care i.e. finalize the child's "permanency plan." *Id.* § 430.12.

38.     ACS is responsible for ensuring children in foster care receive adequate medical care. "Health supervision is a continuing responsibility of the children's services caseworker and medical assistance staff." *Id.* § 507.1. For children with evidence of "emotional disturbance or behavior disorder," mental health resources must be provided. *Id.* § 507.4(b).

39.     ACS's duties in this regard include the provision of necessary medical care in a suitable facility, including supervised settings, "under the proper safeguards," where necessary. Soc. Svc. § 398(6). ACS is further "charged with the duty of seeing that all persons with a mental illness within their respective communities who are in need of care and treatment at a hospital are admitted to a hospital pursuant to the provisions of this article." N.Y. Mental Hyg. Law § 9.47(a).

40.     Psychiatric and psychological services must be made available appropriate to the needs of children in care. Tit. 18, § 441.15.

## FACTUAL ALLEGATIONS

### I.     ACS

41.     ACS is the largest child protection services agency in the country. With an annual budget of around $2.7 billion, and over 7,000 employees, it fields over 40,000 reports of suspected child abuse and/or neglect per year.[7]

42.     As its mission, ACS claims that it "protects and promotes the safety and well-being of New York City's children, young people, families, and communities by providing excellent child welfare, juvenile justice, and early care and education services." First among its "key commitments" is that "[n]o child we come into contact with will be left to struggle alone with abuse or neglect."[8]

43.     In reality, ACS operates as a state-sanctioned predator, targeting vulnerable families with traumatizing "investigations" and forcible family separations.[9]

---

[7] ACS receives approximately $1.1 billion in federal funding along with about $842 million from NYC and $777 million from New York state.

[8] ACS, https://www.nyc.gov/site/acs/about/about.page, (last accessed Dec. 18, 2025).

[9] ACS's pattern of unmitigated racial disparities has been documented *ad nauseam*. With its roots in slavery, family separation remains a violent means of racist subjugation. In 2022, in New York City, a Black child was seven times more likely than a white child to face family policing (i.e. a child protective investigation), and one out of every two Black children in New York City will have been the subject of an investigation by the time they reach the age of 18. ACS, "NYC Public Schools & New York State Office Of Children And Family Services Announce Strategies To Address Racial Disproportionality In The Child Welfare System" (Oct. 19, 2023), www.nyc.gov/assets/acs/pdf/PressReleases/2023/address-racial-disproportionality.pdf; The Bronx Defenders, "'This Wound Is Still Fresh': Stories of Family Survival in the Face of the Administration for Children's Services Racism" (June 2025), https://www.bronxdefenders.org/wp-content/uploads/2025/06/ACS-racism-report-FINAL.pdf; Legal Services NYC, "The Far-Reaching Impact of ACS's Discriminatory Investigations on Women of Color and Survivors of Gender-Based Violence" (April 2025), https://www.legalservicesnyc.org/wp-content/uploads/2025/04/Report-ACS-Discriminatory-Investigations.pdf; NYCLU, *Racism at Every Stage: Data Shows How NYC's Administration for Children's Services Discriminates Against Black and Brown Families* (Dec. 21, 2023), https://www.nyclu.org/en/press-releases/new-report-details-nyc-children-services-agency-discrimination-against-black-and (reporting that Black people comprise 23% of New York City's population but Black parents are the subjects of 38% of initial reports of child maltreatment); New York State Bar Association Committee, "Racial

44. ACS is known to intentionally or recklessly omit crucial information from petitions seeking removal in family court. *E.g., Kurtz v. Hansell*, 20 Civ. 3401 (PAE), 2021 WL 1143619, at *15 (S.D.N.Y. Mar. 24, 2021) (describing how ACS "doubled down" on a false claim in a removal petition in statements that, as pled, "were recklessly false, and had no basis in the records or reports before ACS at the time").

45. Child protective agencies are especially ineffective at meeting the needs of children with mental health diagnoses.

46. Nationally, nearly 80% of children in foster care battle mental health issues, compared to just 18-22% of children in the general population.[10]

47. While in foster care, children with mental health needs struggle to access mental health treatment, which lengthens family separation and impedes their reunification with their families.[11] Children who require mental health services are frequently inadequately supported in family foster care and instead moved to more restrictive congregate institutional settings where they often languish for extended periods of time. *Id.*

48. Additionally, ACS regularly flouts its own policies and recommendations when it comes to addressing the mental health needs of children in its care.

49. A 1998 case granted class certification to plaintiffs who had endured ACS' child protective system, and approved a subclass of plaintiffs where ACS had

> [f]ail[ed] to develop and maintain an adequate array of placements, place[d] children in homes and facilities not best suited to their needs, and fail[ed] to ensure continuity and stability of placements in violation of Adoption Assistance Act and SSL requirements that children be placed in the least restrictive, most family-like,

Justice and Child Welfare: Report and Recommendations of the Committee on Families and the Law" (April 2022), https://nysba.org/wp-content/uploads/2022/03/Committee-on-Families-and-the-Law-April-2022-approved.pdf.
[10] *Mental Health and Foster Care*, Nat'l Conference of State Leg. (Nov. 1, 2019), https://www.ncsl.org/research/human-services/mental-health-and-foster-care.aspx.
[11] Written Testimony of The Legal Aid Society's Juvenile Rights Practice, N.Y. City Council Comm. on Mental Health, Disabilities and Addiction, *Oversight Hearing – Accessing Mental Health Services for NYC Youth*, Nov. 9, 2022.

and most appropriate setting, and in foster homes or other institutions that accord with recommended standards regarding admissions, safety, sanitation, and civil rights protections.

*Marisol A. v. Giuliani*, No. 95 Civ. 10533 (RJW), 1998 WL 199927, at *3 (S.D.N.Y. Apr. 23, 1998).

50.     In another case – in which the child suffered sexual abuse, neglect, inappropriate placements, and a complete lack of necessary medical care while in foster care – the Court held,

> As a result [of ACS's disregard, the child] failed to receive specialized education and recommended mental health treatments during that time. [The child's] lack of medical treatment was nothing new. Throughout [the child's] time in the [kinship placement's] Home, [the kinship placement] failed to ensure that he received necessary medical and mental health care. [The kinship placement] would frequently miss [the child's] scheduled appointments, which caused [the child's] treatment to be delayed or missed entirely. Foster Care Defendants were aware of [the kinship placement's] habit of missing appointments because they sent her notice of them.

*K.S. v. City of New York*, No. 21 Civ. 04649 (PAC), 2023 WL 6608739, at *6 (S.D.N.Y. Oct. 10, 2023).[12]

51.     In another class action case, *Elisa W. v. City of New York*, No. 15 Civ. 5273, 2024 WL 3913089, at *4 (S.D.N.Y. Aug. 23, 2024), *reconsideration denied,* 2024 WL 5155127 (Dec. 18, 2024), the plaintiffs were a proposed class of 6,487 children under ACS's care who filed suit alleging "systemic deficiencies" in the administration of the City's foster care system. The Court found that:

> ACS internal reports demonstrate that ACS officials have been aware of flaws with its placement practices; for example, a 2012 Office of Placement Administration report found that "blanket referrals are made without accurate and up-to-date information on the availability and compatibility of the placement[s]." (Office of Placement Admin. Update, North Decl. Ex. 57, ECF No. 442.) In addition, a 2016 internal review assessing ACS's placement practices stated that "[t]he term 'Dial and Smile' has been used [ ] to describe the current placement process, whereby

---

[12] "During the time that [the child] lived in the [kinship foster home], he physically fought with teachers, school staff, and other students, became violent, touched other children's genitals, and would smear feces on walls and urinate in various places around his home." *K.S.*, 2023 WL 6608739, at *4.

calls are made to provider agencies to provide any available bed for a child."
(Placement Module Report at 2, North Decl. Ex. 51.)

*Id.* at 4.

## II.    Jade Smith

52.     Jade Smith was an extremely gifted, creative, passionate child with severe mental health struggles that posed a constant threat to her survival. She was a prolific artist, always drawing and painting.

53.     In May 2019, Jade attempted suicide for the first time by trying to hang herself in her bedroom at age nine.

54.     She was subsequently hospitalized for three weeks and was diagnosed with Post-Traumatic Stress Disorder (PTSD), dissociative identity disorder, and depression.

55.     Upon her return home, Jade began waking up screaming in the night. Her parents would run into her bedroom to find her crying and screaming that there were bugs crawling all over her body. Each time, they did their best to soothe her and calm her down. They removed her blankets and flipped her mattress over to show her that the bugs had just been a dream. Whatever they did, Jade continued to insist the bugs had been there.

56.     Months later, Jade began to see a frightening "black figure" which would appear in her bedroom. She described the figure as tall and skinny, with no face. Within the year, the "black figure" had begun chasing her and following her outside and to school.

57.     Jade's parents worked together to create as much safety and stability for her as they could. During the COVID-19 pandemic, as Terri was pursuing a degree in medical technology, she and Jade often sat side-by-side doing their schoolwork together. Jade was especially interested in her science classes, and liked to talk about her aspirations to pursue STEM education in her future.

58.     In 2021, at age 11, Jade tried to kill herself by overdosing on pills. She was hospitalized repeatedly, including one in-patient program that lasted nearly two months. She was diagnosed with PTSD, Major Depressive Disorder (severe) and Psychosis (unspecified).

59.     By March 2022, the hallucinations had become terrorizing. Jade, now 12 years old, was plagued by voices of the "figure" – and people she identified as her own parents and others from her past – instructing her to kill herself and others. She got so scared that she asked to be taken back to the hospital, where she was admitted on an emergency in-patient basis.

60.     Medical providers there, noting the "daily command auditory and visual hallucinations" she suffered, concluded that Jade was "actively suicidal with intent and plan." Indeed, she reported that she had made numerous attempts to walk into traffic and had a plan to kill herself by cutting herself with some pieces of broken glass she was keeping, deeply enough that she could bleed to death. She explained to medical providers that "I wanted to kill myself to not be in from one place to another" and "It seems relaxing that after I die I stop, it's a break from everything." She explained that she thought about following the commands just to silence the voices in her head.

61.     Jade was hospitalized for four days in which she began psychotherapy and a regimen of anti-psychotic medication which her providers hoped would stabilize her. The medication mitigated, but did not stop, the hallucinations. For example, on March 28, Jade's school's social worker reached out to her parents to discuss her concerns that Jade had reported that the "figure" had been following Jade throughout the school day.

62.     Throughout it all, Jade's parents focused on maintaining a loving connection with her: an integral part of the tooth-and-nail fight alongside her for her survival. That summer Jade and

Richard watched their favorite anime shows together, as they always had, and looked forward to the release of new content in the fall they could watch together.

63.     Terri had begun working as a medical technician at Weill Cornell hospital. She learned of a five-week inpatient mental wellness program it offered, consisting of individual and group counseling sessions, demonstrations on how to deal with mental health issues, planned trips and social events. Terri planned to enroll Jade; the whole family would participate. Jade was excited about it.

64.     That summer, in July 2022, Jade told Terri that someone had come into her bedroom a few nights earlier and touched her.

65.     Jade described that she had been lying in bed on a Friday night when she heard her bedroom door open. She quickly closed her eyes and pretended to be asleep. She then felt someone groping her breast and buttocks.

66.     In response to Terri's gentle questions, Jade confirmed that there had been no other similar incidents, and that she had not felt anyone touching her genitals.

67.     Terri asked Jade if she had been dreaming about anything in particular; Jade responded that she had been thinking and dreaming about a boy she had a crush on at school. Terri suggested that maybe what Jade had "felt" had been a dream about this boy, and Jade agreed.

68.     Jade did not accuse any particular individual at first. However, she later insisted that Richard had been the assailant.

69.     This was impossible. Richard had been an overnight security guard for the past decade and always worked the overnight shift on Fridays. When Terri reminded Jade of Richard's schedule, Jade then said the incident could have occurred on a Saturday.

70.     Terri had years of experience soothing Jade after her frightening auditory, visual, and tactile hallucinations. She also found it difficult to imagine Richard would do anything like what Jade was describing; he was a loving father who had no history of any inappropriate behavior. However, she broached the topic with him to confirm whether anything had happened. Richard was primarily simply confused by what she was saying.

71.     In an abundance of caution, Terri also disclosed what Jade had told her to Jade's biological father, Andrez Johannes ("Johannes Jr."). The three adults agreed that they felt confident this was a continuation of the hallucinations which had been plaguing Jade for years.

72.     About a month later, on August 27, 2022, Jade told a friend that Richard had come into her bed, about a month before, and touched her breasts and buttocks. Jade said that when she told her mother, her mother brushed her off, saying, "maybe it was a dream." The friend told her mother, who called ACS.

### III.    ACS Wreaks Havoc on the Nimmo Family

73.     That same day, ACS investigators visited the Nimmos' home, where they spoke with Richard and Terri.

74.     The Nimmos were open and forthcoming with ACS. They described the nightmare of terrifying hallucinations which had tormented Jade for the past three years, the various conversations about Jade's experience, and the conclusion all three adults had reached.

75.     The next day, ACS investigators interviewed Jade. Her interview remained consistent with what she had told her mother.

76.     They also spoke with Jade's siblings, then aged 11 and 3. Although there were no allegations of corporal punishment, ACS "assessed" the children's bodies for "suspicious marks or bruises" by lifting their shirts and pulling down their pants.

77.     The family agreed that Jade had been struggling lately with anger and defiance. In particular, just a few days earlier, Richard had intervened during a heated argument between Terri and Jade. However, there were no signs of abuse or any inappropriate conduct from the children or anywhere else.

78.     Eager to cooperate, the parents nevertheless voluntarily agreed to send all three children to Terri's parents house for the weekend as an emergency safety plan.

79.     Jade immediately complained that her maternal grandparents were unpleasant and strict and asked if she could go live with her paternal grandfather, Andre Johannes ("Johannes Sr."), instead. A few days later, ACS agreed to relocate her there.

**A. Removal**

80.     If ACS gave any consideration to the information regarding Jade's mental health diagnoses and behavior the Nimmo family had shared, or made any credible attempt to investigate the facts of the situation, there is no indication of it in their notes or in their subsequent actions.

81.     From the outset, ACS staff, including Child Protective Specialist ("CPS") Taeisha Coleman, Supervisor Nadia McLeod, and Supervisor Stacey Melhado, were aware that Jade had diagnoses of PTSD and dissociative identity disorder, that she was on medication, that she had been hospitalized in 2021 after suicidal ideations and attempted to overdose, and that she was engaged in therapy at Maimonides.[13]

---

[13] The ACS case notes, entered by McLeod on August 28, 2022, mention all of these high-risk factors. Further case notes, entered by Coleman on September 1, 2022, note that Jade had a diagnosis of depression and PTSD. Case notes entered by Melhado on September 2, 2022 additionally note that Jade has a diagnosis of depression and PTSD and that she is "reported to take medication." On that date, Melhado noted that Jade "should be referred for trauma focused services." ACS never referred her for such services.

82.     Yet, ACS did not contact Jade's therapist, psychiatrist, friends, or neighbors. It did not review her medical history. It did not even attempt to confirm what medications she was prescribed nor what she discussed with her therapist at an appointment she attended after the alleged incident.[14]

83.     Instead, on September 2, 2022, ACS filed a petition in Kings County Family Court seeking determinations that Richard had sexually abused Jade and that Terri had neglected her by "failing to provide [her] with proper supervision or guardianship by allowing to be inflicted harm or a substantial risk thereof."

84.     The petition asks the Court to order that Jade be removed from her mother's custody. It is signed by Coleman on behalf of Dannhauser.

85.     Defendants did not include in the petition or otherwise address Jade's extensive history of hallucinations, the discussion Terri had with Jade's biological father, nor any other salient facts. It simply omitted any reference to those facts from the narrative it presented to the judge. Instead, the petition inaccurately states that Jade reported that "about a month ago she was laying in her bed when her step-father came into her room and laid in the bed with her. According to Jade, the lights were out, and she said [he] grabbed by her breasts and then grabbed her by her buttocks."

86.     Though all three adults in Jade's life agreed that the incident had been a dream or a hallucination, Defendants' position was that Terri was at fault for suggesting to Jade that she might have been dreaming, and thereby had neglected of her daughter.

---

[14] Had it done so, ACS would have learned that Jade had a therapy appointment on August 11, 2022, after the alleged incident. At that appointment, she did not mention any assault, although she did say she had recently heard a voice telling her to hurt herself and run away. It also would have learned of the psychiatric evaluation done by Dr. Thwin in the spring of 2022 where Jade described visual hallucinations of a "tall, black, shadow figure" that she would see at school throughout the day, which was taunting her to kill herself mostly at night.

87.     As to Terri, Defendants only included the following two sentences in the petition:

According to Jade, she told her mother the next day that [Richard] grabbed her breasts and buttocks, and her mother said it was just a dream. The respondent mother admitted to the undersigned on or about August 29, 2022, that she told Jade what [Richard] did was just a dream.

88.     ACS further alleged that Daniel and Aria must also be in danger – "derivatively neglected" in ACS verbiage – and must be separated from Richard as well.

89.     That day, lacking information regarding Jade's auditory and visual hallucinations or various mental health diagnoses, the Court granted ACS's petition for Jade's temporary removal from her parents' care and remanded her to ACS custody.[15]

90.     And thus began the systematic dismantling by ACS of every source of love, security, and comfort in Jade's young life.

   **B. Neglect**

91.     Jade no longer had a stable home. She no longer had her mother looking out for her safety or ensuring she continue attending her therapy appointments and taking her medications. Nor did she even have the company of her siblings. It was a dangerous situation for her.

92.     Terri was terrified about how Jade would fare without her parents' support – Jade had never before lived with her paternal grandfather. She especially worried about Jade's continued compliance with her medical treatment. She therefore told Coleman, the ACS case worker assigned to the case, about the Weill Cornell program in which she had hoped to enroll her daughter and explained why it would be beneficial to Jade. Coleman immediately dismissed her, but assured Terri that she would diligently report back regarding Jade's progress.

---

[15] Jade's siblings were released to their mother, with ACS supervision, on the conditions (among others) that she agree to announced and unannounced ACS home visits and allow the ACS Case Worker to speak to the children privately. Richard was ordered to stay away from Jade and xxx. He was permitted ACS-supervised visits with Daniel. Jade was remanded to ACS with a restrictive placement – meaning ACS could not move her without court approval – to Johannes Sr.

93. She did not.

94. On September 15, ACS conducted a "mental health screening" of Jade. However, the screening notes are farcically inaccurate and incomplete.

95. The notes reference vague "concerns" that in 2021, Jade was engaging in unspecified "self-injurious behaviors," without mentioning her credible suicide attempts and lengthy repeat hospitalizations not only in 2021 but continuing into 2022. The notes mention Jade's PTSD and Dissociative Identity Disorder diagnoses, but not her major depressive disorder or psychosis. There is no mention of hallucinations.

96. Most glaringly, the report states that Jade had started therapy "due to concerning behaviors (i.e. absconding from the home, yelling and screaming, emotional dysregulation)" rather than as part of inpatient treatment for the severe delusions and crippling suicidality: a complete fabrication.

97. Though the report mentioned Jade's self-reported "strong bond" with her therapist, ACS made no efforts to contact her or any of Jade's other providers.[16] ACS similarly did not make any additional referrals to mental health evaluators or potential resources; it did not make any referrals to the State Office of Mental Health or Children's Single Point of Access ("CSPOA"), "a centralized referral system for children and youth with serious emotional disturbance who need intensive mental health services to remain safely at home," for Jade or her family.

98. On September 15, 2022, just two weeks after Jade had moved in with him, Johannes Sr. began to struggle with her difficult behavior. He reported that her behavior was at times "out of control" and that she "yells and screams when she does not get what she wants."

---

[16] A September 23 ACS note provides that ACS is to "make efforts to speak with key collaterals which includes, neighbors, schools, PCP and Jade's MH provider" but, other than leaving a single voicemail for Jade's therapist on September 26, nobody did.

99. Terri had been worrying that Jade needed more attention than Johannes Sr. was willing or able to provide her. She knew that Jade wanted to move in with him so she would have more freedom to do as she pleased. In September, Terri told Coleman that she was concerned that Jade could end up in danger without adequate adult supervision, especially in light of her recent past hospitalizations.

100. Coleman disregarded Terri's concerns. She responded that the 12-year-old was free to choose where and with whom she lived.

101. But Terri was right to be concerned. On October 4, 2022, after an argument with Johannes Sr., Jade ran away from home. After a lengthy search, police found her in lower Manhattan around 10:30 p.m.

102. Terri felt hopeless and powerless. ACS was actively thwarting her from helping to protect her daughter from known harm.

103. ACS, on the other hand, was not concerned by this turn of events. It ignored rules and regulations requiring it to report the incident to the police, interview Jade upon her return, conduct a medical examination of her as well as a safety assessment, and discuss any changes or support that might help her. Instead, Jade was simply released back to Johannes Sr. once she was located.

104. On October 11, Coleman submitted a report to the Court that was supposed to document the success of the ongoing placement. Shockingly, Coleman omitted any mention of the incident from her report.

105. Instead, Coleman reported "concerns" about the placement with Johannes Sr.:

> Since this placement there have been ongoing concerns with [Jade]. [Jade] reports that, she "has not been happy being in the home." [Johannes Sr.] reports that here have been ongoing challenges regarding the child's behaviors while in his home.

[Johannes Jr.] has informed CPS that he would like for his child to come live with him.[17]

106.    Recall that ACS had removed Jade from her mother's custody based solely on how she had initially responded to Jade's report of the purported incident. At the time, Terri had discussed the accusations with Johannes Jr., who had agreed with Terri and joined in her course of action. Yet, ACS did not consider Johannes Jr.'s conduct as a barrier to custody – even as the exact same conduct had, in its view, justified Jade's removal from Terri's home.

107.    On October 28, 2022, Jade ran away again from Johannes Sr.'s home.

108.    Johannes Sr. told Terri that Jade was missing; Terri immediately called Coleman. Coleman assured Terri that she was aware of the situation and would be in touch. However, when Terri called back a few minutes later, Coleman's phone went straight to voicemail. Terri reached out to the NYPD who similarly could not get in touch with Coleman; no one was able to reach Coleman throughout the day and night.

109.    The NYPD eventually located Jade at the Utica Avenue subway station. When the officers questioned Jade, she begged them to call her mother. The officers called Terri who immediately began running from her apartment to the train station, and soon got into an Uber, which dropped her off at the train station. When Jade saw her mother arrive, she immediately hugged her and refused to let her go. Later that evening, Terri safely returned Jade to her grandfather's home pursuant to the family court order.

110.    The next day, Johannes Sr. and his mother, Celine Johannes, took Jade to Kings County hospital and reported that they believed Jade had been sexually assaulted during the time that she had run away. A social worker at the hospital called in a report to the state central registry,

---

[17] Johannes Jr. was living in a "Single-Room Occupancy," but expressed that if Jade were to live with him, he would have a better chance at securing placement at a homeless shelter for families, which would ostensibly be a much nicer place to live.

stating that Jade had been missing from their home for over 12 hours on October 28. The social worker reported that while Jade was missing, she went with an adult male to his residence where he gave her juice that caused her to vomit and pass out.

111.    ACS did nothing whatsoever and did not even document the incident other than a brief reference to the sexual assault in its notes on November 25, nearly a month later.

112.    By mid-November, Johannes Sr. had decided he was unable to manage Jade's behavior and could no longer take care of her. Thus, once again, the question of where Jade should be placed arose.

113.    Despite Johannes Jr. dealing with his own mental health issues, including diagnoses of PTSD and dissociative identity disorder, Coleman decided that Jade should be moved to his care.

114.    In mid-November, ACS moved Jade to Johannes Jr.'s care. Jade stayed with her biological father for two weeks, until he had a mental break and had to be hospitalized.

115.    After being released from the hospital, Johannes Jr. told Terri that Jade could no longer stay with him as her presence was "not good for his mental health." Because Terri did not have any other family Jade could live with, she immediately contacted Coleman about the situation. Terri asked Coleman if Jade could be placed in a residential treatment center ("RTC") like the one her employer, Weill Cornell, provided.

116.    Coleman replied that if she were to place Jade in an RTC, ACS would first have to "take [Jade] and put her in foster care with strangers." Coleman reiterated that if Terri couldn't find anyone to take Jade immediately – meaning in the next few minutes – ACS would simply place Jade with strangers. No mention was made of a therapeutic foster home with foster parents who had been specifically trained in caring for children with various mental health diagnoses. Had Coleman or any of her supervisors taken the time to find such a potential therapeutic home

through an agency, and explained that the foster parents were specifically trained to care for a child with Jade's needs, perhaps Terri would have welcomed the placement. But ACS did not search for such placement, nor did any of the case workers on supervisors assigned to the Nimmo matter sit down with the Nimmos and explain any such options.

117.    At the suggestion that Jade might go into foster care with strangers, Terri's heart dropped. Desperate, Terri called Johannes Sr. and begged him to take Jade back. He refused.

118.    In a panic, Terri asked Johannes Sr. if he knew of anyone else who could temporarily take care of Jade. Johannes Jr. suggested his friend, Suyapa Martinez. With no other option, Terri agreed, and Jade promptly moved in with Martinez.

119.    On November 25, Jade ran away from Martinez's home. Martinez called Terri to inform her that her daughter was missing.

120.    Again, Terri immediately called Coleman, but she could not reach her once again. Terri called the police and spent hours on the phone with the officers trying to locate her daughter.

121.    The NYPD eventually found Jade with a friend. Jade had gone up to the friend's roof to attempt suicide and her friend had managed to stop her from jumping and called the police.

122.    Jade was hospitalized at Maimonides Medical Center for two weeks.

123.    ACS failed and refused, again, to follow any of the protocols regarding a child "absent without consent" designed to assess Jade's safety.

124.    On December 7, Coleman submitted another court report. The report makes clear that ACS had not actually been keeping track of where Jade was residing. Though Jade had moved in with Martinez, the ACS report essentially repeated the prior report's content:

> Since the placement of Jade [with Johannes Sr.] there are concerns. Jade has not been happy being in the home. [Johannes Sr.] has also made it clear that does not wish to keep the child in his home due to her behavior. [Johannes Jr.] has informed CPS that he would like for his child to come live with him. [Johannes Jr.] has also

stated that he is willing to go into the NYC Department of Homeless Services in order to have his child be with him. [. . . ]

CPS was informed by [Johannes Sr.] that he did not wish to have SC back into his home due to the issues that they were having. [Johannes Jr.] informed CPS that he felt that needed to go check himself into the hospital due to his Mental Health concerns. [Johannes Jr.] stated that a family friend is willing to assist with caring for SC while he was in the hospital.

125.    This time ACS at least bothered to report that Jade had run away, even if no steps were taken to try to safeguard her:

On 11/25/22 CPS was informed that SC Jade ran away. Jade was later found on the roof of a building by NYPD, it was reported that Jade was having suicidal ideation. Jade was taken to Cohen's Children's Medical Center. The evaluation is pending.

126.    On December 9, the Family Court issued an order that Jade "be temporarily placed under the care of the Commissioner of ACS pending further proceedings herein" and authorizing Jade's temporary release to Martinez, who was described as "seek[ing] approval as a foster parent pursuant to the Social Services Law."

127.    On Christmas Day, Terri went to her parents' house, not knowing Jade would be there visiting as well. As soon as Jade saw her mother, she ran into her arms and told her how much she loved her. Terri cherished the embrace then quickly fled, terrified that ACS would find out and punish her by removing her other children.

128.    It would be the last time they saw each other.

### C.  Jade Dies by Suicide

129.    By January 2023, ACS still had not spoken with Jade's treating providers. It had no insight into her mental state or treatment after her two-week inpatient hospital stay in December. Neither the recent sexual assault, nor Jade's recent suicide attempt, triggered any investigation into Jade's safety.

130. On January 5, Jade told her psychiatrist that she was continuing to suffer "command hallucinations" and intrusive suicidal thoughts. On January 9, she told her therapist the same thing.

131. On January 15, at around 11 p.m., Martinez called the police to notify them that Jade was missing.

132. On January 16, a passerby found Jade's body near the East River.

133. Unaware that Jade had been missing, Terri began receiving messages of condolence from family and various community members, including the school principal, the parents of Jade's friends, Johannes Sr. and Martinez. When Terri asked everyone what they were talking about, no one elaborated.

134. With her heart racing, Terri went to Johannes Sr.'s apartment to demand more information. When Terri arrived, she saw that the Johannes family was all gathered together including Johannes Sr.'s mother, Johannes Jr., Martinez and her boyfriend.

135. There, Martinez confirmed that Jade had died.

136. Terri could not believe her ears. If her daughter was dead, wouldn't ACS have called her? She had not heard from anyone at ACS and therefore refused to believe it was true.

137. It was only when Martinez showed Terri newspaper articles about Jade's death online that Terri came to the heartbreaking realization that her daughter was dead.

### D. Punitive Harassment

138. ACS workers wasted no time in getting down to the important business. First, that same day, there was a rush of back-dated case notes entered. Unlike the perfunctory, even disdainful case notes that predated them, these notes were filled with care and concern.

139.    One note, authored on January 17, described how on January 9, ACS had purportedly "informed [Terri] of the services that are offered to her and her family. [Terri] was informed that [the ACS case planner] will work with the entire family and also working to help rebuild the relationship between [Terri and Jade]." No other such efforts had been documented.

140.    At the same time, ACS dramatically escalated its intrusions, seemingly desperate to somehow retroactively justify its actions in separating the family.

141.    The very next day, January 18, ACS caseworker Shutel Paquiyauri-Gonzalez visited the two surviving children at home. During the visit, Gonzalez repeatedly asked the children about Terri's parenting, despite the children repeatedly stating that they did not have any issues. The purpose of these visits, evidently, had shifted; now, given the family's "current emotional state," ACS sought to ensure that the Nimmos could "provide adequate care to" Daniel and Aria.

142.    Of course, no allegations had been made at any point about the sufficiency of Terri's care, emotional or otherwise.

143.    That day – just two days after their older sister had died – ACS made the children take off their shirts and pull down their pants so that Gonzalez could "assess [them] for marks or bruises."

144.    On January 23, the Family Court issued an Order permitting temporary reunification of the remaining family members to grieve together in their home, noting the "extraordinary and tragic circumstances of this case."

145.    The Court also noted that Daniel had testified that his sister often made things up and that Daniel did not believe the accusation to be true. The Court noted that Jade's mental health history – which ACS had omitted from its petition – cast doubt upon her allegations:

> The Court has learned that the deceased teen had significant mental health issues
> and multiple psychiatric hospitalizations, both prior to this case and since filing,

even after being removed from the Family's home to live with her Biological Father. This raises some doubt about the truth of her allegations here.

146.    Undeterred, ACS continued its monitoring and surveillance of the Nimmos.

147.    The same day, Coleman called Daniel's school to assess whether he was coming to school in clean clothes and "appeared neat." Unsatisfied with the school counselor's response that she had "no concerns" regarding Daniel, Coleman asked her to contact Daniel's teachers individually. There were no concerns amongst the teachers. Still, Coleman noted in her ACS case notes that Daniel, "[came] to school with his hair uncombed once or twice" and occasionally wore a hooded sweatshirt which he "refuse[d] to take off." No explanation is provided why it was important for the child to remove his sweatshirt in late January.

148.    Perhaps most grotesque was ACS's sudden interest in speaking to Jade's treating healthcare providers – something which could actually have helped her while she was alive.

149.    On January 26, ACS spoke with Jade's therapist for the very first time. ACS supervisor Aja Paniagua explained that that the agency was "gathering as much information as possible to support Jade's disclosure of abuse" and asked the hospital to "provide any additional details surrounding Jade's treatment and overall disclosures" as "that would greatly support our ongoing attempts to maintain the safety of her surviving siblings."

150.    That day, Paniagua emailed the Maimonides team attempting to rewrite Jade's history:

> Like mentioned on our phone call, we are gathering as much information as possible to support Jade's disclosure of abuse. The child did suffer from mental health symptoms and displayed a level of ongoing risky behaviors, but she also displayed a level of consistency in the fact that she did not feel safe. If you can provide any additional details surrounding Jade's treatment and overall disclosures, that would greatly support our ongoing attempts to maintain the safety of her surviving siblings. We continue to have concerns with the caretakers, as they displayed a level of neglect while caring for Jade.

151.     There was no pretense that these actions were undertaken with any thoughts of the family's safety. Rather, ACS seemed to realize that without Jade's live testimony, it could not sustain its charges of neglect or abuse, which had to be found to be both credible and corroborated by other evidence. *E.g., Matter of Nicole V*., 518 N.E.2d 914 (N.Y. 1987).

152.     Even though ACS knew that no evidence existed other than Jade's initial accusation, and that it would be unable to prove its case at a family court trial, it continued its investigation and prosecution of the Nimmos.

153.     Instead of leaving the family to grieve in peace, ACS's surveillance of the family became increasingly traumatizing following Jade's death.

154.     On January 27, at 1:34am, ACS caseworker Geoffrey Burgess conducted an unannounced home visit to "[check the children] for marks and bruises." On January 28, at 1:23am, ACS caseworker Emmanuel Okon made another unannounced visit to "ensure the mother [was] providing appropriate supervision" to her children.

155.     The Nimmos became more and more distraught by ACS's unjustified and invasive tactics. During a visit in late January, Richard expressed to caseworker Ariel Semper that ACS's incessant involvement in their lives has been "emotionally exhausting" and he "only wants to take care of his children and return to their normal life." He added that ACS continually failed to do anything "when [his] daughter was alive and running away," but that "since the death, everyone has been on [him]."

156.     The ACS notes and court reports all showed that the Nimmos were providing a safe home for Daniel and Aria and there was never any allegation from any source that Richard had done anything inappropriate to his biological children. Yet, ACS continued "investigating" the Nimmos for over a year after Jade's death.

157.    The Nimmos' lives effectively collapsed under the weight of the family's grief and catering to ACS's constant demands for immediate responsiveness, which had become a full-time job. Neither parent was able to sustain their employment. They lost eligibility to their housing voucher due to the change in family size. Within months, the couple had lost not only their jobs but also their home. They moved into a shelter.

### E. Family Court Exonerates the Nimmos

158.    In 2024, ACS was finally forced to show its hand regarding its petition of abuse and neglect against the Nimmos at the fact-finding hearing.

159.    On February 2, 2024, the Family Court dismissed ACS's petition against Terri Nimmo with prejudice.[18]

160.    On April 1, the Family Court dismissed the petition against Richard with prejudice. The Court described the sexual abuse allegations against Richard, under all the circumstances, as "extremely difficult to believe."

161.    The Court took an even harsher view of Defendants' allegation that Terri had "acted below the minimum standard of care." It held that she "had been as attentive as a parent could have been to Jade's considerable mental health needs." It continued:

> As a final note, the Court commends [the Nimmos] for their demeanor throughout this proceeding and their commitment to their two surviving children in having followed all of this Court's orders and persisting in fighting these allegations despite how painful it must have been…
>
> The fact that this occurred when Jade had not been living with the family for more than 4 months compounds the loss. Jade's mother and stepfather, who had raised her since infancy, were not in a position at that time, given court orders, to assess or have any opportunity to recognize the extremity of Jade's emotional state in

---

[18] Even thereafter, ACS continued to harass the Nimmo family with frequent unannounced home and school visits. At one, in mid-February 2024, an ACS worker asked Terri where Jade was currently located, and if Jade was going to be "out for the moment." Terri was horrified that ACS was asking her about her daughter who had been dead for over a year. She had nightmares and panic attacks about this cruel interaction for weeks.

January of 2023; this leaves these parents with an extra level of unanswerable questions that follow any suicide.

In this Court's oral decision dismissing the petition against the mother prima facie, the Court noted that [Ms. Nimmo] had been as attentive as a parent could have been to Jade's considerable mental health needs, which started at the young age of 9, and sought care for Jade at several hospitals and residential treatment centers as well as taking steps at home to soothe and counter her fears and hallucinations. However, at the time of Jade's death, her care was in the hands of ACS and other family members. The Court hopes that this family can find some solace in knowing the love and care they gave Jade during the time she was in their home and continue to find ways to honor her memory, now with the stress of this legal proceeding hopefully behind them.

*In Re Smith-Nimmo Children,* Dkt. Nos. NA-16906-8-22 at 13, (N.Y. Fam. Ct., April 1, 2024).

162.    A few days later, ACS conducted its final home visit and closed the case. Just like that, the traumatic ACS investigation was over.

163.    Of course, its effects remain. The nightmare of losing their 13-year-old child to a preventable tragedy is not one the Nimmos will ever escape.

164.    There was only one thing the Family Court got wrong. The Nimmos' questions are not "unanswerable." There will be a reckoning.

And ACS will pay.

## FIRST CAUSE OF ACTION:
### 42 U.S.C § 1983: Substantive Due Process
*On behalf of Terri Nimmo and the Estate*

165.    Each of the foregoing allegations is incorporated as if fully set forth herein.

166.    A state assumes an affirmative duty under the Fourteenth Amendment of the U.S. Constitution to provide reasonable care to and protect from harm a child it has taken into its custody. When Defendants remove a child from his or her parents, they assume an affirmative duty under the Fourteenth Amendment to protect that child from harm and risk of harm.

167.     A state assumes an affirmative duty under the Fourteenth Amendment to, among other

things:

>     a)     protect each child in foster care from physical, psychological and emotional harm;
>     b)     provide to each child in foster care the services necessary to ensure his or her
>     physical, psychological and emotional well-being; and
>     c)     provide to each child in foster care conditions, treatment and care consistent with
>     the purpose and assumptions of ACS custody.

168.     The Fourteenth Amendment guaranteed Jade substantive due process rights, including,

but not limited to:

>     a)     the right to protection from unnecessary intrusions into her emotional wellbeing
>     while in ACS custody;
>     b)     the right to services necessary to prevent unreasonable and unnecessary intrusions
>     into her emotional well-being while in ACS custody;
>     c)     the right to conditions and duration of placement reasonably related to the purpose
>     of ACS custody;
>     d)     the right to treatment and care consistent with the purpose and assumptions of
>     ACS custody;
>     e)     the right to be cared for by her mother; and
>     f)     the right to be placed in appropriate custody pursuant to the high level of her
>     mental health needs to accomplish the purpose served by taking her into ACS custody.

169.     The Fourteenth Amendment guaranteed Ms. Nimmo substantive due process rights,

including, but not limited to her liberty interest in the care and companionship of her daughter,

Jade.

170.     By the foregoing actions and inactions, Defendants have acted under color of state law to

violate these duties to Jade and her mother.

171.     The foregoing actions and inactions of the Defendants constitute a policy, pattern,

practice, or custom that is inconsistent with the exercise of professional judgment and amounts to

deliberate indifference to Jade's and Terri Nimmo's constitutionally protected liberty interests,

including, but not limited to:

>     a)     Policy, practice or custom of deliberately ignoring children's mental health
>     diagnoses and allowing the children to languish in homes ill-suited to their needs;

b)      Policy or custom of failing to identify appropriate resources of foster care homes or treatment facilities for children with extreme mental health needs;

c)      Policy or custom of conducting aggressive and intrusive investigations into reports of abuse and neglect even when there is no reasonable basis to believe the reports may be founded, and in fact, there is abundant evidence to the contrary;

d)      Policy or custom of removing children from their parents' care, custody or control even when there is no imminent risk to the child's life or health; and

e)      Policy or custom of failing to make the appropriate referrals to state or city services, such as CSPOA.

172.    The foregoing actions and inactions of Defendants amount to a policy, pattern, practice or custom that is inconsistent with the exercise of professional judgment and amounts to deliberate indifference and conscience-shocking violations of Jade and her mother's constitutional rights.

173.    As a result of Defendants' conduct, Jade and her mother were deprived of the substantive due process rights conferred on them by the Fourteenth Amendment.

174.    As a direct result of the Defendants' violations of the U.S. Constitution, Jade has suffered harm, including, but not limited to, becoming so mentally unwell that she committed suicide. By failing to place Jade in an appropriate foster care placement, keep track of her whereabouts, and provide her with the appropriate mental health resources, Jade was egregiously and outrageously harmed.

175.    As a direct result of the Defendants' conduct, Terri has been deprived of her right to family integrity and association, of her right to be free from unnecessary and unreasonable intrusion into her mental and emotional stability and wellbeing, and of her right to be under governmental supervision no longer than is necessary, as conferred on her by the Fourteenth Amendment. As a direct result of the Defendants' violations of the U.S. Constitution, Terri has suffered immense grief due to the loss of her oldest child, including post-traumatic stress disorder, panic attacks, insomnia and nightmares.

176.    The City assumes the responsibility and risks incidental to the maintenance of ACS and

its employment of attorneys, caseworkers and others. Additionally, the actions of the individual

Defendants were in keeping with ACS policy, practice and/or custom. Defendants are therefore

liable for their violations of the U.S. Constitution and the damages that such violations caused to

Jade and Terri.

177.    Plaintiffs are entitled to an award of compensatory damages, attorney's fees, and costs as

against all Defendants, and punitive damages as against the individual Defendants.


**SECOND CAUSE OF ACTION:**
**42 U.S.C § 1983: Malicious Prosecution**
*On behalf of Terri and Richard Nimmo*

178.    Each of the foregoing allegations is incorporated as if fully set forth herein.

179.    As a matter of policy or custom, under color of state law, Defendants:

a)  seek removal without having completed an investigation into the facts;
b)  seek removal without having complied with their own other legal and regulatory
    prerequisites;
c)  seek removal and remove children from their parents' care, custody or control even
    when there is no imminent risk to the child's life or health;
d)  conduct aggressive and intrusive investigations into reports of abuse and neglect even
    when there is no reasonable basis to believe the reports may be founded, and in fact,
    there is abundant evidence to the contrary;
e)  fail to make complete statements of facts to the Court;
f)  misrepresent evidence to the Court;
g)  remove children from their parents' care, custody or control even when there is no
    imminent risk to the child's life or health;
h)  fail to comply with legal and statutory requirements throughout removal proceedings;
i)  seek removal from mothers against whom no wrongdoing on their own part has been
    alleged; and
j)  continue prosecuting removal proceedings even after there is no legal or factual basis
    to do so and where that lack thereof is evident and will undoubtedly lead to a
    dismissal of charges due to lack of evidence.

180.    These practices are so persistent and widespread as to imply the constructive

acquiescence of senior policymakers.

181.     Defendants' policies and customs caused the Plaintiffs to be subjected to a denial of their constitutional rights.

182.     To wit, Defendants initiated and continued a Family Court removal proceeding seeking to remove Jade from her parents' custody and seeking to remove Daniel and Aria from their father's custody, which they successfully did.

183.     The proceeding resulted in the family's separation and, accordingly, implicated Plaintiffs' personal liberty and privacy interests under the Fourth Amendment of the U.S. Constitution.

184.     Defendants initiated and continued the removal proceeding without probable cause.

185.     Defendants failed to make complete statements of facts to the Family Court, thereby misrepresenting the evidence. The intentional omission of these facts was consequential: it resulted in a removal order of Jade from her parents' care, her remand to the care of ACS and the initiation and continued prosecution of the Nimmos.

186.     Defendants acted in bad faith and were motivated by actual malice.

187.     The proceedings were terminated in Plaintiffs' favor.

188.     Defendants' decisions were such substantial departures from accepted professional judgment, practice, or standards as to demonstrate that the persons responsible actually did not base their decisions on such judgments.

189.     Defendants violated Plaintiffs' constitutional rights under color of state law.

190.     As a result, Plaintiffs have suffered emotional distress and physical injury and have incurred attorney's fees and costs.

191.     Defendants acted willfully and with malice and/or reckless indifference to Plaintiffs' Constitutional rights.

192.    Plaintiffs are entitled to an award of compensatory damages, attorney's fees, and costs, as

against all Defendants, as well as punitive damages as against the individual Defendants.

### THIRD CAUSE OF ACTION:
### Title II of the Americans with Disabilities Act
*Against NYC only, on behalf of the Estate*

193.    Each of the foregoing allegations is incorporated as if fully set forth herein.

194.    Title II of the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12131 *et seq.*,

provides that "no qualified individual with a disability shall, by reason of such disability, be

excluded from participation in or be denied the benefits of the services, programs, or activities of

a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

195.    Public entities, such as ACS, must "administer services, programs, and activities in the

most integrated setting appropriate to the needs of qualified individuals with disabilities." 28

C.F.R. § 35.130(d).

196.    To state a prima facie claim for violation of Title II of the ADA, a plaintiff must establish

"(1) that she is a qualified individual with a disability; (2) that she was excluded from

participation in a public entity's services, programs or activities or was otherwise discriminated

against by a public entity; and (3) that such exclusion or discrimination was due to her

disability." *Fulton v. Goord,* 591 F.3d 37, 43 (2d Cir. 2009) (internal quotation marks and

alterations omitted). A claim can be established based on disparate treatment, disparate impact,

or failure to make a reasonable accommodation. *Id.*

197.    The Supreme Court has ruled that the unjustified institutionalization of persons with

mental disabilities violates Title II. *Olmstead v L.C. ex rel. Zimring*, 527 U.S. 581, 597 (1999).

Courts have since held that the ADA also prohibits states from placing people with mental illness

"at serious risk of institutionalization or segregation," even if they reside in the community. *See,*

*e.g.*, *Davis v. Shah*, 821 F.3d 231, 262-63 (2d Cir. 2016); *United States v. Mississippi*, 400 F. Supp. 3d 546, 553 (S.D. Miss. 2019) (collecting decisions).

198.    A plaintiff "need not wait until the harm of institutionalization or segregation occurs or is imminent" in order to bring a claim under the ADA. *Davis v. Shah*, 821 F.3d 231, 259-60 (2d Cir. 2016). Rather, a plaintiff establishes a "sufficient risk of institutionalization to make out an *Olmstead* violation if a public entity's failure to provide community services ... will *likely* cause a decline in health, safety, or welfare that would lead to the individual's eventual placement in an institution." *Id.* (emphasis added).

199.    ACS repeatedly placed Jade at serious risk of institutionalization when it failed to accommodate her disability by placing her in an appropriate placement, sufficient to meet her needs; indeed, as described herein, she was hospitalized on at least two occasions during her short-lived four-month tenure in ACS's care before she died.

200.    Jade was a resident of New York with serious mental health diagnoses that were known to ACS: PTSD and major depressive disorder, which constitute disabilities under the ADA, as well as psychosis and dissociative personality disorder.

201.    Plaintiff Terri Nimmo repeatedly requested that ACS place Jade in a therapeutic program or facility. This was a reasonable request given Terri's knowledge of her daughter's mental health needs and history.[19]

202.    While Jade was remanded to ACS, an agency that purports to have the sole purpose of protecting children, it failed to accommodate Jade's disability by not placing her in a home or residential treatment center that could meet her needs and protect her from harm.

---

[19] *Kennedy v. Dresser Rand Co.*, 193 F.3d 120, 122 (2d Cir. 1999) ("On the issue of reasonable accommodation, the plaintiff bears only the burden of identifying an accommodation, the costs of which, facially, do not clearly exceed its benefits." *Id.* This burden is not a heavy one. *See id.* Moreover, the question of whether a proposed accommodation is reasonable is "fact-specific" and must be evaluated on "a case-by-case basis.")

203. As a result of ACS's failures, Jade died by suicide.

204. The Estate is entitled to an award of compensatory damages, attorney's fees, and costs.

### FOURTH CAUSE OF ACTION:
### Negligence
*On behalf of the Estate*

205. Each of the foregoing allegations is incorporated as if fully set forth herein.

206. Defendants owed Jade a duty of reasonable care because they had a special relationship with her.

207. Defendants owed Jade a duty to protect her from harm and ensure she was appropriately supervised and cared for while she was in their care.

208. Defendants breached their duties to Jade, creating a foreseeable risk of harm to her.

209. As a result, she suffered emotional and psychological distress, physical injury, mental anguish, loss of enjoyment of life, pain and suffering, and death.

210. No negligence on the part of Plaintiffs contributed to Jade's injuries.

211. Defendants' actions have the character of outrage associated with crime.

212. The Estate is entitled to an award of compensatory damages as against all Defendants and punitive damages as against the individual Defendants.

### DEMAND FOR RELIEF

WHEREFORE, it is respectfully requested that the Court enter judgment, in amounts to be determined by the finder of fact, as follows:

a) On the First Cause of Action, as against all Defendants, awarding compensatory damages, attorney's fees, and costs to Terri Nimmo and the Estate;

b) On the First Cause of Action, as against the individual Defendants, awarding punitive damages to Terri Nimmo and the Estate;

c) On the Second Cause of Action, as against all Defendants, awarding compensatory damages, attorney's fees, and costs to Terri Nimmo and Richard Nimmo;

d) On the Second Cause of Action, as against the individual Defendants, awarding punitive damages to Terri Nimmo and Richard Nimmo;

e) On the Third Cause of Action, as against NYC, awarding compensatory damages, attorney's fees, and costs to the Estate;

f) On the Fourth Cause of Action, as against all Defendants, awarding compensatory damages to the Estate;

g) On the Fourth Cause of Action, as against the individual Defendants, awarding punitive damages to the Estate; and

h) granting such other relief as may be just.

## DEMAND FOR TRIAL BY JURY

Pursuant to FRCP § 38(b), Plaintiffs demand a trial by jury.

Dated:     Brooklyn, New York
            January 20, 2026

Respectfully submitted,

*Julia Elmaleh-Sachs*
Julia Elmaleh-Sachs
Susan Crumiller
Crumiller P.C.
16 Court St, Ste 2500
Brooklyn, NY 11241
(212) 390-8480
julia@crumiller.com
susan@crumiller.com
Attorneys for Plaintiffs